**PENNSYLVANIA STATE POLICE, Petitioner,**

v.

**PENNSYLVANIA STATE TROOPERS ASSOCIATION (Trooper Rodney Smith), Respondent**

Commonwealth Court of Pennsylvania.

Argued May 5, 1997.

Decided July 24, 1997.

Michael C. Barrett, Assistant Counsel, Harrisburg, for petitioner.

James L. McAneny, Harrisburg, for respondent.

Before DOYLE and PELLEGRINI, JJ., and MIRARCHI, Jr., Senior Judge.

PELLEGRINI, Judge.

Because it is incomprehensible that an arbitrator would put back to work a state trooper who, after drinking heavily, pulls his service revolver on a woman in the midst of a disagreement and threatens to blow her brains out, the Pennsylvania State Police petitions for review of an arbitration decision finding no just cause for the dismissal of Trooper Rodney Smith.

The facts are not disputed. On the evening of May 19, 1995, Smith, who was off-duty, left a bar about 6:30 p.m. where he had been drinking since noon. He saw an old girlfriend, whom he had not seen for four or five years, and he stopped his car and induced her to stop her car. Smith allegedly wanted to speak to her because he believed she owed him money, about 30 dollars. An argument ensued between them, ending when Smith pulled his service revolver, forced it between her teeth and threatened to "blow off your head". Smith then drove away to continue drinking. He later returned to the scene, where the woman had summoned the police. Smith was arrested, charged with three counts of driving under the influence and one count each of simple assault and making terroristic threats. He pled guilty to the five charges.

Based on this incident, the State Police notified Smith that he was dismissed because his actions violated the regulations regarding "Unbecoming Conduct" and "Conformance to Laws". Smith, through the Pennsylvania State Troopers Association (Union), grieved his dismissal. The arbitrator found that although the record clearly established that Smith committed the criminal offenses, the discipline imposed was excessive.[1] The Arbitrator modified the discharge by directing an immediate reinstatement of Smith (amounting to a suspension of eight and one-half months), without payment of lost wages, and imposed one year of probation.

The State Police argue that it is manifestly unreasonable for an arbitrator to put back to work a state trooper who had been dismissed by the State Police for egregious, criminal behavior, lessening the public's trust in its law enforcement. While the manifestly unreasonable standard is applied to arbitrators' decisions regarding all other public employees,[2] in *Pennsylvania State Police v. Pennsylvania State Troopers' Association (Trooper James Betancourt)*, 540 Pa. 66, 656 A.2d 83 (1995), the Supreme Court, reversing this court, rejected such a review over an arbitrator's awards under Act 111.[3] The Supreme Court held that a court's scope of review over an arbitrator's award in Act 111 grievance arbitration is narrow certiorari, which is limited to questions regarding: (1) the jurisdiction of the arbitrator, (2) the regularity of the proceedings, (3) an excess of the arbitrator's powers,[4] and (4) deprivation of constitutional rights. *Id.*

Even though we would emphatically agree with the State Police that the arbitrator's decision was manifestly unreasonable because Smith's conduct—excessive drinking, brandishing his service revolver against a

---

1. The Arbitrator stated that the just cause analysis was "whether, on a comparative basis, discipline had been meted out fairly and uniformly." (Arbitrator's decision, p. 6).

2. An extremely narrow exception first set forth in *Philadelphia Housing Authority v. Union of Security Officers #1*, 500 Pa. 213, 455 A.2d 625 (1983), the manifestly unreasonable doctrine has been applied to all public employees except police officers and fire fighters. *See County of Centre v. Musser*, 519 Pa. 380, 548 A.2d 1194 (1988); *Liquor Control Board v. Independent State Stores Union*, 520 Pa. 266, 553 A.2d 948 (1989); *American Federation of State, County and Municipal Employees v. Borough of State College*, 133 Pa.Cmwlth. 521, 578 A.2d 48, 51 (1990). *See also DePaulo v. City of Albany*, 49 N.Y.2d 994, 996–97, 406 N.E.2d 1064, 1066, 429

N.Y.S.2d 171, 172 (1980) (Wachtler, J., concurring) ("In view of the singular responsibility and trust necessarily reposed in our police it would seem essential that the determination as to whether an officer should remain on the force, at least in cases where the conduct in question concerns a violation of the officer's oath, should be made only by those persons entrusted by the public with that responsibility. Only those persons ... are directly answerable to that community.")

3. Act 111 is the commonly used name of the Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1 –217.10, which applies to police and fire personnel.

4. An arbitrator exceeds his powers where he mandates that an illegal act be carried out. *Id.*

member of the community, forcing the revolver into her mouth, threatening to "blow your head off"—was egregious, criminal and violative of the public trust, we are simply unable to act due to the narrow certiorari standard mandated by the *Betancourt* decision. Under the present state of the law, if Smith had "blown off" the woman's head, as he explicitly threatened to do with the gun in his hand, and the arbitrator had put him back on the job as a law enforcement officer, this court could do nothing. While such an outcome is incomprehensible, it is just as incomprehensible that there is no review or accountability if an arbitrator makes such an irrational decision.[5] Because of our extremely limited review of the arbitrator's decision, no one—not the governor, not the State Police, not this court, not the Supreme Court, unless it reverses *Betancourt,* or the General Assembly, unless it amends Act 111—has the

power to change an arbitrator's irrational award.[6]

■ By putting this trooper back to work, this arbitrator not only increased the risk to the public, but also brought disrespect to the force, making it more difficult for other troopers who carry out their day-to-day duties in a professional and competent manner. We remind arbitrators, even though they may be virtually unaccountable, that they are not involved in the usual industrial arbitration setting.[7] When the employer is a public employer and the arbitrator is acting as a part of the public system, one of his or her basic concerns should be the public trust in police officers [8] or other public employees. When they make their decisions, arbitrators must recognize their fiduciary obligation to the public to make sure that police officers properly serve the community.

Only because we are compelled to do so, we affirm the arbitrator's award.[9]

5. "It is ironic that we can review arbitrators' decisions as being against public interest that relate to clerks and typists, but not police officers" who carry guns. *City of Philadelphia v. Fraternal Order of Police Lodge No. 5,* 658 A.2d 453, 458 (Pa.Cmwlth.1995) (Pellegrini, J., concurring).

6. I am not as sanguine as Judge Doyle about his rationalization that, even absent a narrow certiorari scope of review, the arbitrator's dismissal would be affirmed because the penalty imposed was comparable to other discipline imposed in similar cases. While shooting a bartender off-duty while drinking may be a comparable offense, the only thing comparable about not discharging in that case is that outcome is just as outrageous and irrational as this one. I also disagree with Judge Doyle's conclusion that under Act 111 the parties themselves could adopt a different scope of review—the essence test—if they chose to do so by engaging in collective bargaining. Our Supreme Court in *Betancourt* made it explicitly clear the only scope of review available for both interest and grievance arbitration was set by Act 111 as narrow certiorari. Act 111 only allows parties to bargain regarding concerns related to the terms and conditions of the their employment and nothing else. Moreover, parties are not free to negotiate away a court's scope of review that has been set by statute.

7. "The resolution of labor disputes in the public sector involves complex issues of considerable public import" which an arbitrator, unlike the public employer, is generally unaware of. *Developments in the Law—Public Employment,* 97 Harv. L.Rev. 1676, 1708–09 (1984). "[A]n arbitrator is unelected, unaccountable, and quite pos-

sibly ignorant of how citizens feel about the labor dispute and ancillary matters of public concern." *Id.*

8. This is not just the view of the present writers but is recognized by other arbitrators. In *Delaware River Port Authority v. Independent Bridge Workers,* 76 Lab. Arb. (BNA) 350, 355 (1981) (Raffale, Arb.), the arbitrator wrote:

The reaction by the public to the outrage committed by the employee is a valid standard for determining just cause. The public is unlikely to tolerate a public authority treating with restraint any atrocity committed on an individual member of the public, ... The reaction of the public is relevant when dealing with an organization accountable to the public.

*See also* Roger I. Abrams, *Governance of Public Enterprises: The Power Issue in Public Sector Grievance Arbitration,* 67 Minn. L.Rev. 261, 286 (1982) ("Grievance arbitration must therefore be tailored to the distinctive task at hand—the resolution of disputes between the government and a union representing public workers. The process will flourish in the public sector only if grievance arbitrators ... accommodate the distinctive needs of the public sector.").

9. The State Police also contends that the arbitrator exceeded his authority because he did not determine the issue of just cause based on this case, but was reviewing procedures by searching for proportionality in discipline. The issue presented to the arbitrator allowed him to determine whether dismissal was appropriate and, if not, what action should be taken against Smith. To determine what that disciplinary action should

## ORDER

AND NOW, this 24th day of July, 1997, the award by Arbitrator Stanley J. Schwartz sustaining the grievance filed by the Pennsylvania State Troopers Association on behalf of Trooper Rodney Smith is affirmed.

DOYLE, Judge, concurring.

I concur in the result reached by the majority, to affirm the award of the arbitrators. I do not join in the strident tone of the majority opinion that evinces a frustration with higher authority which is uncommon in judicial opinions, most especially with opinions from this Court.

Specifically, I do not join in the challenge to our Supreme Court to reverse their decision in *Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt),* 540 Pa. 66, 656 A.2d 83 (1995), which the majority views as the sole obstruction to reaching the correct and desirable result in this case: "Even though we would emphatically agree with the State Police that the arbitrator's decision was manifestly unreasonable because Smith's conduct ... was egregious, criminal and violative of the public trust, we are simply unable to act due to ... the *Betancourt* decision." (Op. at 689–90.)

The Pennsylvania Supreme Court's opinion in 1995 in *Pennsylvania State Police (Betancourt)* was both thorough and judicially sound. By that decision, the Supreme Court, after reviewing the historical background of Act 111,[1] held that Act 111 commands judicial review of both interest and grievance arbitration awards under the narrow certiorari scope of review.[2] The Court so held because it found that such was the intent of the General Assembly when it wrote into the Act that "[n]o appeal [from an arbitration award] shall be allowed to any court." *Id.* at

77 n. 15, 656 A.2d at 89 n. 15; *see* 43 P.S. § 217.7(a). In so holding, the High Court specifically rejected the "essence test" employed in private sector arbitration awards and in awards for public sector employees under the Public Employe Relations Act (PERA),[3] which pertains to public employees other than police and fire personnel.

There are two separate and discrete reasons why the majority is in error in its analysis: the first concerns the specific facts in this appeal; the second concerns the narrow certiorari scope of review under which the majority chafes when reviewing an Act 111 grievance arbitration award.

### I. The Specific Award on Appeal

While the majority opinion states that "the facts are not disputed," and thereby sets its own stage for a finale which can emit of no other result, the facts the majority refers to deal only with Trooper Smith's conduct, and, while certainly true, are only one part of the total question which was presented to the arbitrator. The complete issue placed before the arbitrator also included a comparison of the discipline in Smith's case with other similar cases, or, as arbitrator Schwartz stated:

> The issue to be resolved from a just cause point of view is not [just] the egregiousness of Smith's behavior but whether, on a comparative basis, discipline has been meted out fairly and uniformly.

(Arbitrator's Award at 6.)

The majority completely ignores this part of the issue, as well as the arbitrator's discussion of it, and thereby totally reads it out of the equation solely on ideological and "public policy" grounds.

After the arbitrator first considered the conduct of Smith, which he did find to be egregious and inexcusable, he considered

be, the arbitrator compared the discipline imposed in what he considered to be similar cases. Although the parties may disagree about whether cases are similar, again, given our very limited scope of review, we cannot reverse the arbitrator's award.

1. Act of June 24, 1968, No. 111, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10.

2. The Court stated: "From this [historical] review, we conclude that there is no justification

for establishing a scope of review for Act 111 *grievance* arbitration awards which differs from the scope of review for Act 111 *interest* arbitration awards." *Pennsylvania State Police (Betancourt),* 540 Pa. at 76, 656 A.2d at 88 (emphasis in original).

3. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101 to 1101.2301.

mitigating circumstances (Trooper Smith was a 13-year veteran with an excellent work and disciplinary record) and further gave consideration to the specific discipline of Smith's termination as it compared to the discipline awarded by the State Police itself in other similar cases.[4]

Rather than paraphrase Arbitrator Schwartz, I believe the award should speak for itself:

> I have compared this case to other similar cases I have heard in order to consider comparative discipline and the uniform handling of such discipline. In addition, the Commonwealth entered into the record-PSP Exhibit 2, the *Branyan case* (1994), and PSTA discussed on the record at the hearing the *Normandy case* (1989).... I must point out that I have heard one of the few cases that is almost identical to the *Smith case*. It is the *Jones Award*. Further, the *Dance Award* which was quoted in the *Jones Award*, and the original *Dance Award* heard by another arbitrator about a year earlier can also be cited.
>
> ....
>
> The *Normandy Case* appears to have been more egregious than this one. This Award was not submitted, but the facts were discussed on the record with no dispute from the Commonwealth. This case involved off-duty drinking and a wounding of a bartender by an off-duty Trooper using a handgun. Apparently, Normandy was court-martialed and, according to the facts presented at the hearing, given a 27-day suspension.
>
> The *Jones* and *Dance Awards* are much more analogous, with the *Jones* case quite similar and almost identical. Neither of these Troopers were dismissed. Both were spousal abuse cases, as was the original *Dance* case.
>
> Jones was arrested and charged with aggravated assault, simple assault, recklessly endangering another person and terroristic threats. There was no alcohol involved, but *Trooper Jones did threaten to kill his wife ... with a handgun which he testified was not his service revolver*. Her testimony indicated that she was as frightened as the woman in this case contended she was in the court transcript. The evidence also indicated that Mrs. Jones had been assaulted by her husband but not battered as badly as Mrs. Dance had been.
>
> Further, Jones had an excellent disciplinary record and was considered a good State Trooper. While there was no alcohol involved, and it was a spousal abuse case, a handgun and physical assault with terroristic threats were involved, a close analogy to this case. **Jones' grievance concerned a court-martial and a twenty-day suspension.** The DDO [disciplinary officer] at the time was Major Thomas Williams. I found that, over the years, Major Williams was a fair man with a clear understanding of disciplinary cases. He testified in the *Jones* case that the discipline imposed upon that grievant was in keeping with discipline imposed in similar cases.
>
> ....
>
> When I compare the disciplinary approach to Smith, who was dismissed, with that of Jones, who was not dismissed, where the only real difference is the DUIs, where the assault and terroristic threats were similar and actually where the victim [in *Jones*] was physically beaten, I am persuaded that the Department should have approached disciplining Smith differently. **It did not have cause to dismiss Smith, just as it did not dismiss Jones.** Accordingly, I find that the Department did not have just cause to discharge Trooper Smith.

(Arbitrator's Opinion at 5–8.) (Emphasis added.) (Footnotes omitted.)

In my view, such an individually tailored award is well within the jurisdiction of the arbitrator to consider, and, although I may not agree with it or would have decided the disciplinary issue differently, the award was certainly not in excess of the arbitrator's authority to determine.

---

4. The Arbitrator's view was expressed as such: "In an organization of 6,000 plus employees, the only way to discipline fairly and to guarantee due process is to clearly impose discipline uniformly throughout the organization." (Arbitrator's Opinion at 5.)

Neither party in this appeal disputes that, if the arbitrator found that there was no just cause *for termination*, then the arbitrator could reduce the discipline to what he believed would be appropriate and uniform throughout the corps of State Police.

## II. The Narrow Certiorari Scope of Review Over Act 111 Grievance Arbitration Awards

### A. The Pennsylvania State Police is not required to accept a narrow certiorari scope of review.

I believe that, even under Act 111, it is possible that the parties themselves could have adopted a different scope of review if they had chosen to do so by engaging in collective bargaining. *Appeal of Upper Providence Police*, 514 Pa. 501, 526 A.2d 315 (1987); *Township of Moon v. Police Officers of Township of Moon*, 508 Pa. 495, 498 A.2d 1305 (1985); *Fraternal Order of Police v. Hickey*, 499 Pa. 194, 452 A.2d 1005 (1982). Justice Larsen, speaking for a unanimous Supreme Court in *Appeal of Upper Providence Police*, explained:

In *Township of Moon*, this court reviewed an arbitration award that established a binding grievance arbitration procedure **in conformity with the Uniform Arbitration Act, and we held that the arbitrators could legitimately establish such a procedure.** 508 Pa. 495, 498 A.2d at 1312. The majority reasoned that, although Act 111 did not establish a binding

grievance arbitration mechanism (as opposed to 'interest' impasse arbitration), neither did it expressly preclude [the] adoption of such mechanism, and thus, the grievance arbitration procedure awarded by the arbitrators was within their authority and was affirmed. *Id.* 508 Pa. at 507, 498 A.2d at 1310–11, citing *Chirico v. Board of Supervisors for Newton Township.*

*Appeal of Upper Providence Police*, 526 A.2d at 320 n. 3, 514 Pa. at 513 n. 3 (emphasis added).

Advancing this principle further, which permits the *procedures* of the Uniform Arbitration Act (UAA), 42 Pa.C.S. §§ 7301–7320, to be employed in an Act 111 grievance arbitration award, and which may be adopted as a separate provision in an Act 111 interest award, the State Police could have bargained to have placed into the parties' collective bargaining agreement (CBA) a provision to have the "essence test" scope of review applied in appeals from grievance arbitration awards.[5] While, arguably, the arbitrators would have been prohibited in an Act 111 interest arbitration award to provide for a different scope of review, that is, other than narrow certiorari,[6] nothing would prevent the parties from voluntarily agreeing to such a provision in their CBA. *Fraternal Order of Police v. Hickey.*

When the majority opinion decries the failings of Arbitrator Schwartz, and all arbitra-

---

**5.** *See* Section 7302(d) of the Uniform Arbitration Act (UAA), 42 Pa.C.S. § 7302(d), which provides:

Where this paragraph is applicable a court in reviewing an arbitration award pursuant to this subchapter [the Court] shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict.

*See also Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977), in which the Supreme Court adopted the "essence test" from federal decisional law, first announced by the United States Supreme Court in *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), and held that the

judgment n.o.v. standard from the U.A.A. is "quite consistent" with the essence test.

**6.** Justice Ralph Cappy, in *Pennsylvania State Police (Betancourt)*, in footnote 11 wrote:

*Township of Moon* confined itself to discussing how a grievance arbitration panel could properly deviate from Section 4 of Act 111, the section covering composition and methods of a grievance arbitration panel, and how the panel could conform to the UAA's provisions in these matters. Section 4 concerns the procedures to be employed; it does not, however, touch upon judicial review of arbitration awards. Scope of review was not discussed in *Township of Moon.* **We now make it clear that *Township of Moon* should not be read as condoning the UAA's essence test as the scope of review for Act 111 grievance arbitration awards.**
540 Pa. at 75 n. 11, 656 A.2d at 88 n. 11 (emphasis added).

tors in similar circumstances, that **they** "must recognize **their** fiduciary obligation to the public to make sure that police officers properly serve the community," it myopically narrows on only one part of the entire process and criticizes, improperly in my view, *his* decision which "increased the risk to the public" and "also brought disrespect to the force," (Op. at 690), while ignoring the fact that the State Police itself might have changed the process of judicial review or, what is much more important, that Pennsylvania's General Assembly could have changed it, and did not; and what more appropriate body is there to establish Pennsylvania's public policy than its General Assembly?

## B. The General Assembly has legislated the narrow certiorari scope of review and has rejected the essence test/judgment N.O.V. scope of review.

It was Pennsylvania's General Assembly which adopted the narrow certiorari scope of review in Act 111 when it wrote into the Act that no appeal from an arbitration award "shall be allowed to any court,"[7] and, simply stated, it is the General Assembly which has the authority to change it, if it chooses to do so. With full knowledge that the Supreme Court determined that the "essence test" scope of review is **not** appropriate under Act 111, and that narrow certiorari is the standard, the General Assembly has **not** acted to change that statutory interpretation.

And, as succinctly articulated by Justice Benjamin Jones in *Pennsylvania Labor Relations Board v. Uniontown Hospital Association*, 432 Pa. 146, 247 A.2d 621 (1968):

> It is well settled that the failure of the legislature, subsequent to a decision of this Court in construction of a statute, to change by legislative action the law as interpreted by this Court creates a presumption that our interpretation was in accord with legislative intendment. *See*

*Commonwealth v. Willson Products Inc.*, 412 Pa. 78, 87, 88, 194 A.2d 162 (1963); *Loeb's Estate*, 400 Pa. 368, 375, 376, 162 A.2d 207 (1960), and authorities therein cited.

*Id.* at 149–50, 247 A.2d at 623.

Because the Pennsylvania General Assembly has not acted to change, by legislation, the interpretation which the Supreme Court held to be the legislative intent underlying Act 111, which "was to prevent Act 111 arbitration awards from miring down in litigation," we must presume that the reasoning set forth in *Pennsylvania State Police (Betancourt)* is the correct interpretation. What could be more clear than the words of Justice Cappy:

> We will not now allow a scope of review which is markedly broader than narrow certiorari for Act 111 grievance arbitration. To do so would allow the courts to interfere impermissibly with the legislative scheme as the courts would be able to alter Act 111 arbitration awards by means of an unauthorized expansion of the proper scope of review. Such a result would run counter to the legislature's intent. Thus, we hold that the proper scope of review is narrow certiorari.

*Pennsylvania State Police (Betancourt)*, 540 Pa. at 78, 656 A.2d at 89 (footnote omitted); *see also* John L. Gedid, *Annual Survey of Pennsylvania Administrative Law—Administrative Law Progress in 1995: Important Pennsylvania Supreme Court Decisions*, 5 Widener J. Pub.L. 625, 626–38 (1996).

Moreover, the disinclination of the General Assembly to act in this instance is glaringly apparent when we observe the fact that the Legislature **did act** to change another Supreme Court statutory construction holding *in the same case* as the opinion of that Court rejecting the very public policy argument which the majority now advances.

---

7.  Act 111 provides:
   **§ 217.7. Determination; appeal; implementation; effective date of legislation**
   (a) The determination of the majority of the board of arbitration thus established shall be final on the issue or issues in dispute and shall be binding upon the public employer and the

policemen or fireman involved. Such determination shall be in writing and a copy thereof shall be forwarded to both parties to the dispute. **No appeal therefrom shall be allowed to any court.**
   43  P.S. § 217.7 (emphasis added).

Before the Commonwealth Court in 1988, in *Commonwealth v. State Conference of State Police Lodges,* 117 Pa.Cmwlth. 564, 546 A.2d 697 (1988), there were two major issues presented regarding an Act 111 interest arbitration award. The first issue concerned the pension benefits of State Police officers. The arbitrators awarded members of the State Police Lodges (FOP) retirement benefits which were greater than those which were provided for all state employees under the Commonwealth's Retirement Code, 71 Pa. C.S. § 5955.

The Commonwealth contended that an award of increased pension benefits was expressly prohibited by Section 5955 of the Retirement Code,[8] and that the arbitrators, in awarding expanded benefits, acted in excess of their powers. This Court agreed with that view and struck the pension provisions from the arbitration award.

On appeal to the Supreme Court, the High Court reversed our decision,[9] reasoning:

> To adopt the Commonwealth's argument would be to interject into the Retirement Code the phrase '**nor any arbitration award**,' so that 71 Pa.C.S. § 5955 would read: 'Pension rights of State employees shall be determined solely by this part or any amendment thereto, and no collective bargaining agreement **nor any arbitration award** between the Commonwealth and its employees shall be construed to change any of the provisions herein.' It is not only unnecessary, but it is impermissible, for us to rewrite the statute in such a fashion.

*Id.* at 46, 575 A.2d at 97 (first emphasis added). The Supreme Court's decision declining to read into the Act the emphasized language was filed on May 11, 1990.

A short fifteen months later, on August 5, 1991, the General Assembly enacted into law Act No. 23 of 1991 which "reversed" the decision of the Supreme Court and amended Section 5955 of the Retirement Code by inserting into that section the language "nor any arbitration award," the very language which Justice Flaherty writing for the Court declined to read into the Retirement Code in *State Conference of State Police Lodges.*

No one could reasonably argue that the General Assembly was not acutely aware of the Supreme Court's decision in *State Conference of State Police Lodges.* Likewise, no one could reasonably dispute that the responsive action of the Legislature, taken so soon after the Supreme Court's decision,[10] was a direct response to correct what it felt was an erroneous interpretation of its own legislation.

Simply stated, when the General Assembly disagreed with the Supreme Court's interpretation of the Retirement Code, it acted immediately and decisively to correct it and override the Court.

There was a **second** issue presented to this Court in *State Conference of State Police Lodges* regarding the same interest arbitration award, and this one is of the greatest consequence in our present deliberations. The second issue concerned the disciplining of state troopers.

Prior to our decision in *State Conference of State Police Lodges,* the **exclusive** procedure for disciplining state police officers had been by court-martial proceedings.[11] The arbitra-

---

**8.** Section 5955 of the Retirement Code at that time provided in pertinent part:

> Pension rights of State employees shall be determined solely by this part or any amendment thereto, and no collective bargaining agreement between the Commonwealth and its employees shall be construed to change any of the provisions herein.

71 Pa.C.S. § 5955.

**9.** *Commonwealth v. State Conference of State Police Lodges,* 525 Pa. 40, 575 A.2d 94 (1990).

**10.** Of particular note is the fact that the 1989–90 legislative session ended on November 21, 1990, and all proposed legislation not finally adopted

by that date expired. The new 1991–92 session of the General Assembly began in January of 1991.

**11.** The provisions for the court-martial discipline are set out in Section 711 of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. § 251. Section 711 of the Administrative Code pertinently provides:

> **§ 711 Commissioner of Pennsylvania State Police**
> (a) The Commissioner of State Police shall be the head and executive officer of the Pennsylvania State Police. He shall provide ... for the enlistment, training, **discipline**, and conduct of the members of the force....

tion award changed that and, for the first time, granted to State Police officers the right to elect grievance arbitration rather than submit to a court-martial proceeding. The arbitration award provided as follows:

In the event that a member shall be accused of an offense that would otherwise be subject to Court Martial proceedings under Article XXVI, he shall, simultaneous with the receipt of the notice of the offense, be advised in writing that he may elect to challenge that accusation either through a court-martial proceeding or through the grievance procedure and shall be provided with a form by which to make such election within seven (7) calendar days. When made, the election shall be irrevocable. If not made in a timely manner, it shall be conclusively presumed that the member has elected the court martial procedures.

*State Conference of Police Lodges,* 546 A.2d at 702.

The Commonwealth contended that this provision of the award violated the law in that it contravened Section 711 of the Administrative Code, **that the discipline of state police officers was of such public concern that such matters should not be submitted to grievance arbitration but should remain a matter of basic and inherent managerial right to maintain the integrity of the state police corps.** The FOP contended, on the other hand, that such a provision was lawful as it merely provided an election of remedies permissible under the Supreme Court's holding in *Board of Education of the School District of Philadelphia v. Philadelphia Federation of Teachers Local No. 3,* 464 Pa. 92, 346 A.2d 35 (1975).

This Court agreed with the Commonwealth's argument, vacated that portion of the award (as it did with the pension benefits), and wrote:

*[W]here matters of police discipline are at issue, the impact upon the public*

*can be especially great* **and we believe that by repositing in the Commissioner of the State Police the sole responsibility to determine the ultimate outcome of such discipline, the legislature made the court martial proceeding an essential and integral part of a fundamental statutory scheme. Accordingly, we shall vacate this portion of the award.**

*State Conference of Police Lodges,* 546 A.2d at 703 (emphasis added).

Once again, the Supreme Court reversed this holding and, by way of explanation, wrote:

The Administrative Code, in 71 P.S. § 251, does indeed provide a detailed court-martial procedure, yet we perceive it as being comparable in substance to the provisions of the Public School Code which allegedly vitiated the grievance arbitration procedures which we upheld in *Board of Education, supra.* In the face of arguments fundamentally the same as those presented by the Commonwealth in this case, we upheld a collective bargaining agreement which permitted grievance arbitration of disputes over discipline or discharge though the public employer argued that such disputes were the province of the board of education pursuant to the Public School Code.

. . . .

Courts martial of Pennsylvania State Police held under the Administrative Code, similar to the board of education disciplinary proceedings under the Public School Code, are subject to judicial review under the Administrative Agency Law; courts martial are therefore subject to the same limited standard of review, 2 Pa. C.S § 704, as the teachers' disciplinary proceedings in the *Board of Education* case. As we said there, that type of review is no substitute for an impartial fact-finder in the first instance.

. . . .

(b)(1) Before any enlisted member ... is dismissed or refused reenlistment by the commissioner, the commissioner shall furnish such enlisted member with a detailed written statement of the charges upon which his dismissal or refusal of reenlistment is based, together with a written notice, signed by the commis-

sioner or the proper authority, of a time and place where such enlisted member will be given an opportunity to be heard either in person or by counsel, or both, before a Court-martial Board appointed by the commissioner. (Emphasis added.)

... [W]e do not deem state police 'court-martial' proceedings to be sacrosanct, but rather to involve employment-related disciplinary matters which may appropriately be referred to grievance arbitration.

We therefore reverse the judgment of the Commonwealth Court which held the grievance arbitration of disciplinary proceedings to be repugnant to the mandate of the Administrative Code, 71 P.S. § 251.

*State Conference of Police Lodges,* 525 Pa. at 48–51, 575 A.2d at 98–100 (footnotes omitted) (emphasis added).

Thus, it is clear, after reading the Supreme Court's opinion, that the High Court specifically **rejected** the public policy argument against grievance arbitration which was the basis for this Court's decision.

There has never been a legislative response to this 1990 Supreme Court holding, and, of course, there has never been a legislative response to the Supreme Court's 1995 decision in *Pennsylvania State Police (Betancourt).*

It is readily apparent, therefore, that, while the General Assembly **did** act to override the Supreme Court's statutory construction of the Retirement Code, **the Legislature did not act** to override the Court's statutory construction of grievance arbitration under Act 111, when both issues were dealt with in the same 1990 Supreme Court opinion.

Accordingly, and in conclusion, while I agree that the present grievance arbitration award should be upheld, I do not agree with the majority opinion and concur in the result

only. The Supreme Court has already essentially rejected the public policy arguments which the majority now contends should cause the Supreme Court to reverse its previous decision in *Pennsylvania State Police (Betancourt).* Moreover, the Legislature has deliberately declined to act to "reverse" or "correct" the Supreme Court's holding that the narrow certiorari scope of review is to be applied in judicial review of Act 111 grievance arbitration awards, thereby validating the presumption that such is the correct statutory construction. And, last, this latter conclusion can be demonstrably established by the fact that the General Assembly did act decisively to override another of the Supreme Court's interpretations in the same case where the Supreme Court rejected the majority's public policy argument.[12]

12. I must assume from reading footnote 6 of the majority opinion that the majority would, absent the Supreme Court's decision in *Pennsylvania State Police (Betancourt* ), reverse the arbitration award in the *Normandy* case (where an off-duty state trooper shot and wounded a bartender, was court-martialed, and was given a 27–day suspension) which Arbitrator Schwartz said was even "more egregious" than the *Smith* case.

After considering all of the facts and circumstances in *Normandy,* I might even agree if the standard was a judgment N.O.V. standard; but the words of Justice Cappy in *Pennsylvania State Police (Betancourt)* have significant import:

We have recognized that this restraint on judicial activism is the linchpin of the Act, stating that '[an Act 111 arbitration panel's] resolution of the dispute must be sure and

swift, and much of its effectiveness would be lost if the mandate of its decision could be delayed indefinitely through protracted litigation.' *Washington Arbitration,* 436 Pa. at 173, 259 A.2d at 440 (reviewing an interest arbitration award). Almost fifteen years later, this Court eschewed judicial interference in grievance arbitration stating that the objective of Act 111 'would be completely frustrated if we were to impose, by judicial fiat, a layer of court intervention.' *Chirico [v. Board of Supervisors for Newton Township],* 504 Pa. [71] at 79, 470 A.2d [470] at 475 [(1983)]. *See also Appeal of Upper Providence,* 514 Pa. 501, 511, 526 A.2d 315, 320 (1987); *Guthrie v. Borough of Wilkinsburg,* 508 Pa. 590, 499 A.2d 570 (1985). *Pennsylvania State Police (Betancourt),* 540 Pa. at 78, 656 A.2d at 89.