741 A.2d 1248

**PENNSYLVANIA STATE POLICE, Appellant,**

**v.**

**PENNSYLVANIA STATE TROOPERS ASSOCIATION (Trooper Rodney Smith), Appellee.**

**Pennsylvania State Police, Appellant,**

**v.**

**Pennsylvania State Troopers Association (Trooper Robert K. Johnson), Appellee.**

Supreme Court of Pennsylvania.

Argued Nov. 17, 1998.

Decided Nov. 30, 1999.

Barbara L. Christie, Chief Counsel, Michael C. Barrett, Asst. Counsel, Joanna N. Reynolds, Asst. Counsel, Harrisburg, for Pa. State Police.

Paul A. Tufano, Syndi L. Guido, General Counsel, Office of General Counsel, Harrisburg, for Pa. State Police.

Gary Lightman, James L. McAneny, Harrisburg, for Pa. State Troopers Ass'n.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

CAPPY, Justice.

These matters involve the narrow certiorari scope of review, applicable to appeals from Act 111 [1] grievance arbitration awards [2], as defined by this court's recent unanimous decision of *Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt)*, 540 Pa.66, 656 A.2d 83 (1995). For the reasons that follow, we decline the invitation of the Pennsylvania State Police to expand our *Betancourt* holding and therefore affirm the orders of the Commonwealth Court below.

Each of these matters involves the imposition of discipline on a state trooper who committed acts of misconduct. The facts of the first matter are not in dispute. On May 19, 1995, Trooper Rodney Smith ("Smith"), while off-duty, spent the afternoon drinking at a bar. Upon driving away from the bar, he happened to see Tammy Mathis ("Mathis"), an ex-girlfriend of his, sitting in her car which was parked on the side of the

1. Act of June 24, 1968, P.L. 237, as amended, 43 P.S. §§ 217.1–217.10. Act 111 applies to police and fire personnel only.

2. The term "grievance arbitration" refers to arbitration "which occurs when the parties disagree as to the interpretation of an existing collective bargaining agreement." *Betancourt*, 656 A.2d at 85 n. 2. The term "interest arbitration," on the other hand, refers to arbitration "which occurs when the employer and employee are unable to agree on the terms of a collective bargaining agreement." *Id.*

road. Smith pulled over his car to speak with Mathis. An argument ensued concerning money Smith claimed Mathis owed him. The argument culminated in Smith jamming his loaded, police-issued weapon into Mathis' mouth and threatening to kill her. At that point, Smith abruptly ceased terrorizing Mathis and drove away to continue drinking. Mathis promptly called the police. Smith later returned to the scene where the police who had been summoned by Mathis arrested him. Smith was charged with three counts of driving under the influence and one count each of simple assault and making terroristic threats; he subsequently pled guilty to all five charges.

The Pennsylvania State Police ("State Police") later notified Smith that because of his actions of May 19, 1995, he was dismissed from the force. Smith filed a grievance arguing that his dismissal was improper. The arbitrator concluded that although Smith had committed the acts in question, the discipline of dismissal was excessive. The arbitrator noted that prior to May 19, 1995, Smith's thirteen years of service had been exemplary and that Smith had been under a great deal of stress prior to the incident as a result of his working at the crash site of the USAir jet near Pittsburgh in the fall months of 1994. Yet, the arbitrator stated that these mitigating factors had only a "minimal" impact on his decision. Arbitrator's decision, dated 1/3/97, at 5. Rather, the arbitrator focused on how the discipline the State Police meted out to Smith compared to discipline imposed on other troopers. The arbitrator concluded that since Smith's actions were less egregious than actions committed by troopers whom the State Police had merely suspended, then dismissal of Smith was inappropriate. *Id.* at 6–9. The arbitrator thus sustained the grievance in part and denied it in part, ordering the State Police to reinstate Smith immediately but without back pay.

As with the Smith matter, the facts concerning Trooper Robert Johnson's ("Johnson") misconduct are not in dispute. On December 18, 1995, Johnson attempted to leave a Clover Department Store ("Clover") with $27.58 worth of merchandise for which he had not paid. He was subsequently arrested

by the Cheltenham Township police on a charge of retail theft, a summary offense. An agreement was subsequently reached between Clover and Johnson by which Clover withdrew the charges and Johnson agreed to pay Clover the sum of $177.00 as restitution and a civil recovery penalty.

On June 27, 1996, Johnson was notified that he would be dismissed from his job. Johnson filed a grievance. The arbitrator determined that Johnson had indeed committed the retail theft. Yet, he determined that there was not just cause to dismiss Johnson. The arbitrator reasoned that dismissal was not warranted since other troopers had committed more serious crimes but had received discipline less severe than dismissal. Arbitrator's decision, dated 9/21/96, at 22. The arbitrator also found that dismissal was contraindicated since Johnson had given sixteen years of exemplary service to the State Police prior to this incident and that Johnson had expressed great remorse over his actions. *Id.*

The State Police filed appeals from both determinations. In both matters, the Commonwealth Court affirmed, citing this court's recent unanimous decision in *Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt)*, 540 Pa.66, 656 A.2d 83 (1995). The Commonwealth Court stated that a court reviewing an Act 111 grievance arbitration award has an extremely limited scope of review and that in these two matters, there was no basis upon which it could disturb the decisions of the arbitrators.[3]

3. Although voting to affirm the decisions of the arbitrators, Judge Pellegrini expressed the view (as the author of the majority opinion in *Smith* and the author of the concurring opinion in *Johnson*) that adherence to the narrow certiorari scope of review was ill advised when it allowed troopers such as Smith and Johnson to remain on the force. *Pennsylvania State Police v. Pennsylvania State Troopers Association (Smith)*, 698 A.2d 688, 689–90 (Pa.Cmwlth.1997); *Pennsylvania State Police v. Pennsylvania State Troopers Association (Johnson)*, 698 A.2d 686, 688 (Pa.Cmwlth.1997). The position taken by the learned Judge Pellegrini is not surprising since it was he who wrote the majority opinion for the Commonwealth Court in *Betancourt* advocating a broad scope of review of Act 111 arbitration awards, a position which this court declined to adopt on appeal. As shall be discussed more fully *infra*, we rejected this position in *Betancourt* as we found that the legislature had placed severe limits on our ability to act in this

The State Police filed petitions for allowance of appeal in both matters and we granted allocatur.

The question confronting us in these matters is what is the proper scope of review of an appeal from an Act 111 grievance arbitration award. We had the opportunity to consider this self same point four years ago in *Betancourt*. In that decision, we determined that the narrow certiorari scope of review applied. This scope of review, true to its name, is quite limited. It allows an appellate court to inquire into only four areas: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess of the arbitrator's powers; or (4) deprivation of constitutional rights. *Betancourt*, 656 A.2d at 85.

These severe limits placed on our appellate authority were not self-imposed. Rather, they were dictated by the legislature as part of a carefully crafted plan of remediation to correct flaws in the act which was the predecessor to Act 111. That defunct act, which was commonly known as the Act of 1947,[4] caused severe and socially destabilizing problems as it prohibited police and fire personnel not only from striking but also from engaging in collective bargaining. This double denial of rights to police and fire personnel fueled the growing tension between labor and management, tension which culminated in "illegal strikes and a general breakdown in communication between public employers and their employees." *Id.* at 89.

In creating Act 111, the legislature focused on making the division of rights and powers between management and labor more equitable. Specifically, police and fire personnel were still denied the right to strike, but this disability was offset by the granting of the right to collectively bargain. The legislature also included another provision which was meant to dissipate tensions prior to their building to a point where

arena; thus we are prevented from interfering with an Act 111 arbitration award merely because the arbitrator's determination is unpalatable, or even extremely distasteful, to us.

4. The full citation for the Act of 1947 is Act of June 30, 1947, P.L. 1183, 43 P.S. § 215.1 *et seq.*

labor-management relations would break down and the public safety would be jeopardized. Specifically, the legislature dictated a restraint on judicial activity in this arena, and forbad appeals from an arbitration award. 43 P.S. § 217.7(a). By ensuring the "swift resolution of disputes, [the legislature] decreased the chance that the workforce would be destabilized by protracted litigation, a state harmful to all parties." *Betancourt*, 656 A.2d at 89.

A year after Act 111 was enacted, we had our first opportunity to interpret 43 P.S. § 217.7(a). *Washington Arbitration Case*, 436 Pa. 168, 259 A.2d 437, 440 (1969). We noted that Act 111's prohibition on appeals from an arbitration award was tempered by Supreme Court Rules R. 68½, a rule which was in existence at the time Act 111 was crafted. That rule stated that "[i]f an appeal is prohibited by an Act ... the law is well settled that an appeal will lie to the Courts in the nature of a narrow certiorari...." *Id.* at 441 (citing Supreme Court Rules R. 68½). We stated that not only did application of the narrow certiorari scope of review satisfy the requirements of Rule 68½, but it also had the salutary effect of acting as an adequate safeguard for any constitutional rights to an appeal that parties might have. *Id.* at 440.[5]

The State Police apparently agrees that appeals from Act 111 grievance arbitration awards are subject to the narrow certiorari scope of review. Yet, it expresses the opinion that the arbitrators below exceeded their powers. Thus, the State Police contends, we can reverse these awards on that basis without exceeding our scope of review.

In *Betancourt*, we discussed at length this third prong of the narrow certiorari test. Our definition of what constitutes "an excess of an arbitrator's powers" was far from expansive. We commenced our analysis by noting that "[a]n arbitrator's powers are limited. He or she may not mandate that an

---

5. Although Rule 68½ was rescinded in 1972, this court has made it clear that the narrow certiorari scope of review is still applicable to appeals from Act 111 arbitration awards. *See, e.g., Township of Moon v. Police Officers of Township of Moon*, 508 Pa. 495, 498 A.2d 1305 (1985).

illegal act be carried out; he or she may only require a public employer to do that which the employer could do voluntarily." *Betancourt*, 656 A.2d at 90 (citing *Washington Arbitration*, *supra*, and *Appeal of Upper Providence Police*, 514 Pa. 501, 526 A.2d 315 (1987)). Furthermore, we stated that the arbitrator's award "must encompass only terms and conditions of employment and may not address issues outside of that realm." *Id.* Finally, we stressed that a mere error of law would be insufficient to support a court's decision to reverse an Act 111 arbitrator's award. *Id.*

We hold that pursuant to *Betancourt*, the arbitrators in the instant matters did not exceed their powers. First, ordering that these troopers be reinstated did not mandate that the State Police perform an illegal act.[6] Furthermore, the arbitrators' orders to reinstate the troopers clearly related to the terms and conditions of employment.

█ The State Police, however, contends that the *Betancourt* definition of "an excess of the arbitrator's powers" is incomplete. It argues that an arbitrator can exceed his or her powers not only by ordering an illegal act or an act which does not relate to the terms and conditions of employment, but also by issuing an order which contravenes "public policy". We are unable to accept this position. Broadening the narrow certiorari scope of review to include a provision which would allow the courts to interfere with an arbitrator's award whenever that award could be deemed to be violative of "public policy"—however that nebulous concept may be defined by a particular appellate court—would greatly expand the scope of review in these matters. If we were to adopt the State Police's recommendation to include this ill-defined term within the narrow certiorari scope of review, we would markedly

**6.** While members of municipal police departments are dismissed from service where they have been convicted of a felony or serious misdemeanor, 53 Pa.C.S. § 2164, there is apparently no similar proscription applicable to troopers serving in the State Police force. The decision to add such a similar provision applicable to members of the State Police is one for the legislature, and not this court, to make.

increase the judiciary's role in Act 111 arbitration awards. This would undercut the legislature's intent of preventing protracted litigation in this arena.[7]

We emphasize that these matters are not, as the State Police implies, about whether this court finds the reinstatement of these troopers to be repugnant.[8] Rather, they concern the application of existing legislation. If we were to broaden the narrow certiorari scope of review to the extent propounded by the State Police, we would not be interpreting Act 111 but rather would be rewriting it. Clearly, such a legislative function is denied to the judiciary. *Pap's A.M. v. City of Erie*, 553 Pa. 348, 719 A.2d 273, 281 (1998).[9]

7. In support of its argument that an arbitrator exceeds his powers not only when he orders an illegal act but also when his order violates "public policy," the State Police relies heavily on *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). We find this reliance to be inapt for a couple of reasons. First, the Court in *Misco* was not concerned with interpreting an act such as Act 111, where the legislature, in response to shockingly severe labor unrest in two key sectors of public servants, sharply curtailed judicial review of arbitration awards. Thus, the appeal of *Misco* is superficial at best. Second, even if we were to employ *Misco* for a limited purpose in determining this appeal, it would seem to cut against the State Police's position as the *Misco* Court equated a violation of public policy with the ordering an illegal act. The Court stated that in determining whether an arbitrator's award violates public policy, an appellate court is to examine whether the award creates an "explicit conflict with other 'laws and legal precedents' "; the Court emphasized that the examination was not to focus on the nebulous " ' general considerations of supposed public interests.' " *Id.* at 43, 108 S.Ct. 364. Thus, contrary to the assertion of the State Police, the public policy theory espoused by the *Misco* is not some wide-ranging concept, but rather appears to parallel our accepted definition of an excess of an arbitrator's powers.

8. We stress that in rendering this decision, we are certainly not condoning the actions of these troopers.

9. The State Police also claims that we should reconsider our decision in *Commonwealth v. State Conference of Police Lodges of the Fraternal Order of Police*, 525 Pa. 40, 575 A.2d 94 (1990), wherein we stated that an arbitrator may compel parties in an Act 111 interest arbitration to insert a provision in their collective bargaining agreement which would allow troopers to avoid court-martial proceedings by instead electing to proceed to binding grievance arbitration. We will not review this claim as it was not preserved below. Furthermore, we are skeptical whether this issue, which concerns the *interest* arbitration process, could properly be raised in matters which concern grievance arbitration.

For the reasons stated herein, the orders of the Commonwealth Court are affirmed.

Justice CASTILLE files a concurring opinion.

Justice NIGRO files a concurring opinion.

Justice NEWMAN files a dissenting opinion.

CASTILLE, Justice, concurring.

Due to the legislatively mandated limits on appellate review of Act 111 arbitration awards and this Court's recent expansion of limited review to grievance arbitration awards, *Pennsylvania State Police v. Pennsylvania State Troopers' Assn. (Betancourt)*, 540 Pa. 66, 656 A.2d 83 (1995), I am constrained to join the result reached by the majority. I write separately to express my extreme discomfort that the decisions of the arbitrators in the instant cases are beyond appellate review and to propose that the third prong of the narrow certiorari standard be expanded in grievance arbitration cases to include review of arbitrators' powers where it appears that an arbitrator's decision is manifestly unreasonable, arbitrary and capricious.

The majority acknowledges, and I accept, that the rationale behind limiting appellate review is to ensure stability in the collective bargaining process.[1] *Betancourt*, 656 A.2d at 89. The majority also notes, and again, I accept, that when appellate review is prohibited by a legislative act, "appeal will lie to the Courts in the nature of a narrow certiorari...." *Washington Arbitration*, 436 Pa. 168, 259 A.2d 437, 440 (1969) (citation omitted). One prong of the narrow certiorari standard encompasses review of whether an arbitration award exceeded the arbitrator's powers. *Betancourt*, 656 A.2d at 85. Here, however, the possibility of meaningful review of "unpalatable," "extremely distasteful" and "repugnant" arbitration awards is precluded by the restrictive definition of this prong

---

1. Thus, the legislative purpose of precluding appellate review relates primarily to *interest* arbitration awards.

of the narrow certiorari standard, as initially stated in *Washington Arbitration* and followed in *Betancourt*.[2]

While I agree that, under the current legislative scheme, the proper scope of review in Act 111 grievance arbitration awards is the narrow certiorari scope of review, I believe that an expansion of the scope of review in grievance arbitration cases is warranted where arbitrators ordered the State Police to reinstate Robert Johnson, who committed retail theft, and Rodney Smith, who pled guilty to three counts of DUI, one count of simple assault and one count of making terroristic threats. State Troopers who commit acts such as these should not be permitted to continue to represent the Commonwealth's highest echelon of law enforcement. The citizens of Pennsylvania deserve the best men and women available to enforce the law of the Commonwealth and the State Police should not be forced to continue to employ those who are the subject of this case and who discredit the vast majority of officers who risk their lives on a daily basis for the citizens of this Commonwealth. Thus, in my opinion, the arbitrators' decisions that the State Police lacked just cause to dismiss Johnson and Smith were manifestly unreasonable, arbitrary and capricious. I believe that a legislative scheme that insulates such decisions from appellate review should be revisited by our legislature.

While I am constrained to join the result reached by the majority, I echo the sentiments of Judge Pellegrini, who stated in the Smith case that "it is incomprehensible that there is no review or accountability if an arbitrator makes such an irrational decision," *Pennsylvania State Police v. Pennsylvania State Troopers Assn. (Trooper Rodney Smith),* 698 A.2d 688, 690 (Pa.Cmwlth.1997), and concluded in the Johnson case that "something is terribly wrong when the state police cannot fire a trooper who is a thief!" *Pennsylvania State Police v. Pennsylvania State Troopers Assn. (Trooper*

**2.** This Court applied the narrow certiorari standard to grievance arbitration awards in *Betancourt,* reasoning that Act 111 authorizes grievance arbitration and that the legislative restrictions on appellate review should apply.

*Robert K. Johnson)*, 698 A.2d 686, 688 (Pa.Cmwlth.1997)(J. Pellegrini, concurring). For these reasons, I believe that review under the narrow certiorari standard should be expanded in grievance arbitration cases.

NIGRO, Justice, concurring.

I concur in the majority opinion because I am constrained by the doctrine of *stare decisis* to follow the holding in *Pennsylvania State Police v. Pennsylvania State Troopers' Assn. (Betancourt)*, 540 Pa. 66, 656 A.2d 83 (1995) which limits the scope of appellate review to the four narrow considerations defined therein. *See id.* at 85. However, I believe that the certiorari review as defined in *Betancourt* is too narrow. While I appreciate the majority's reasoning in applying *Betancourt*, I believe the *Betancourt* Court canonized judicial restraint in Act 111 arbitration matters to an unacceptable degree. I would, in light of the matters now before us, add a fifth area to the *Betancourt* scope of review: whether the arbitration decision is repugnant to public policy or shocks the conscience of the court. The appeal of Trooper Smith is just such a case.

Trooper Smith clearly abrogated his duties as a law enforcement officer when he jammed his loaded weapon into his ex-girlfriend's mouth, threatening to kill her. He not only used his police-issued weapon to threaten an innocent private citizen, he did so in a manner and under circumstances which would not be tolerated of a law enforcement officer even in the line of duty. He was dismissed from his law enforcement job, but was subsequently reinstated by the arbitrator. The arbitrator found that the action of the trooper was less egregious than crimes committed by other troopers who were, through the same arbitration process, not dismissed.

It is hard to imagine what offenses on the part of a state trooper might be more egregious than forcing a loaded pistol into another's mouth and still result in that trooper's being retained. It seems to me that if such is the case, the arbitration process veered off course at some point and allowed completely unacceptable police conduct to be arranged

in a hierarchy of egregiousness, raising the bar for dismissal to an unacceptable height. This is precisely the kind of arbitration decision which not only undermines law enforcement's duty to the public but which shocks the conscience of the court.

I am mindful of the underlying policy concerns of the *Betancourt* decision. Nevertheless, I fail to discern how this additional inquiry would hamper the legislature's goal of "swift resolution of disputes." I disagree with the majority in that I don't find the safeguard of allowing appellate review in clear cases of public policy violations such as this to be a "nebulous concept" incapable of definition or enforcement. Furthermore, I am at a loss to see how this inquiry would "destabilize" the workforce to a greater degree than allowing troopers proven to be ill-suited to their profession to remain in positions of public trust.

NEWMAN, Justice, dissenting.

I respectfully dissent because in ordering that the State Police reinstate two troopers who are guilty of serious crimes (terroristic threats and shoplifting); the arbitrator exceeded the limits of his power. Further, in these limited circumstances where the public employer is the State Police, responsible for enforcing the laws of this Commonwealth and protecting the safety of the citizens of this Commonwealth, the public policy of binding arbitration must cede to the public policy of insuring that the employees who are bound to carry out these duties are of the highest integrity and character.

This Court in *Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt)*, 540 Pa. 66, 656 A.2d 83 (1995) adopted "narrow certiorari" to review a grievance arbitration award rendered pursuant to Act 111.[1] In doing so we relied primarily upon *City of Washington v. Police Department of Washington*, 436 Pa. 168, 259 A.2d 437 (1969), where

---

1. This common law doctrine derives from this Court's constitutional power of certiorari to test the jurisdiction of subordinate tribunals. *See e.g., In re 21* st *Senatorial District Nomination,* 281 Pa. 273, 126 A. 566 (1924).

this Court first determined that there was no right of appeal from the binding decision of an arbitration panel, but that review of the award was based upon the principles of common law certiorari. The scope of review set forth in *City of Washington* was as follows:

> If an appeal is prohibited by an Act, or the decision of the Agency is stated to be final or conclusive, the law is well settled that an appeal will lie to the Courts in the nature of a narrow certiorari and this Court will review only (1) the question of jurisdiction; (2) the regularity of the proceedings before the Agency; (3) questions of excess in exercise of powers; and (4) constitutional questions.

*Id.*, 259 A.2d at 441.

In articulating these parameters for reviewing the decision of an arbitration panel, the *City of Washington* Court stated that:

> ***No adjudicatory body has unlimited discretion.*** At the very least, each and every adjudicator is bound by the Constitution of the United States; and most are bound by even tighter strictures. The restrictions ***may*** go to the nature of the controversies which they can decide, the parties who may appear before them, the type of relief they may grant, or any other element in the adjudicatory process.

*Id.* (emphasis added)

In looking to the scope of the arbitrator's power pursuant to Act 111, the Court noted that:

> while the statute (Act 111) contains no express limitations on the power of the arbitrators, ***neither could it fairly be interpreted to impliedly grant public employers the power to do whatever the arbitrators decree if such action is otherwise forbidden.*** No one would argue, for instance, that a public employer could set up different wage scales for its black and its white employees just because the arbitrator so ordered.

*City of Washington*, 259 A.2d at 441, n. 5 (emphasis added).

The *City of Washington* Court proceeded to determine that Act 111 arbitration panels may not order a public employer to

do an act that was forbidden and looked to see whether a "higher authority" prevented the arbitrators from entering the award at issue.

> In spite of the fact that neither the relevant constitutional provision nor the enabling legislation clearly delineates the power of the arbitration panels, we are of the opinion that such panels may not mandate that a governing body carry out an illegal act. We reach this result by quite frankly reading into the enabling legislation the requirement that the scope of the submission to the arbitrators be limited to conflicts over legitimate terms and conditions of employment. Were this not so, virtually any issue could be submitted to the arbitrators under the guise of a labor conflict. *Further, we fully realize that there will be issues that would be fully legitimate in the context of a private sector labor dispute which will not be legitimate in the context of a public sector labor dispute. Public employers are in many respects more limited in what they may do vis-a-vis their employees, and those limitations must be maintained.* The essence of our decision is that an arbitration award may only require a public employer to do that which it could do voluntarily. We emphasize that this does not mean that a public employer may hide behind self-imposed legal restrictions. An arbitration award which deals only with proper terms and conditions of employment serves as a mandate to the legislative branch of the public employer, and if the terms of the award require affirmative action on the part of the Legislature, they must take such action, if it is within their power to do so.

*Id.,* 259 A.2d at 442–43 (emphasis added).

Applying these above stated principles, I believe that the decision of the arbitrator in the cases of Trooper Smith and Trooper Johnson was beyond the scope of his powers. Pursuant to the section of the Administrative Code that governs the qualifications of its force, the State Police can appoint only those who possess certain physical and mental qualifications, and who are of "good moral character." 71 P.S. § 1193. The qualifications generally set forth in Section 1193 are to be

"based upon the standard provided by the rules and regulations of the police force of the cities of the first class." *Id.* This provision, in conjunction with the standard set forth in the First Class Township Code and basic mandates of public policy, limits the power of the State Police to appoint virtually anyone to the police force.

Although the phrase "good moral character" is not defined, the term has widespread use in our jurisprudence and the lack of it has been defined in a court decision as "anything done knowingly contrary to justice, honesty or good morals." *Gombach v. Department of Bureau of Commissions, Elections & Legislation,* 692 A.2d 1127, 1130 (Pa.Cmwlth.1997). Also, "good moral character" in the context of determining professional employment must be assessed in connection with the particular occupation at issue. Here, the crime of shoplifting implicates dishonesty and theft, while the crime of terroristic threats has serious overtones of violence. Both of these crimes in my opinion involve moral turpitude and these officers, as criminal offenders to this degree, cannot hold the confidence of the public in the performance of their jobs as police. As such, I do not believe that these officers have "good moral character" because of the way that term is used within the Administrative Code's articulation of an officer's qualifications for the job.

Further, in looking to the standards set forth in the First Class Township Code as to Police Officers (the Code), as Section 1193 directs, the Code sets forth a specific provision calling for the removal of an officer if he has violated "any law of this Commonwealth which provides that such violation constitutes a misdemeanor or a felony." 53 P.S. § 55645. While the Administrative Code is unclear about which rules and regulations of the "police force of the cities of the first class" should guide basic qualifications for appointment to the State Police, I find no reason to exempt the State Police from the requirement that its ranks be free of serious criminal offenders. Indeed, it would appear a fundamental requirement of this Commonwealth that we not appoint felons to act

as the enforcers of our criminal laws and the protectors of our citizens.

Moreover, the Pennsylvania State Police is granted statutory power to assist the Governor in the administration and enforcement of the laws of the Commonwealth. 71 P.S. § 250. This carries the concomitant duty to ensure the integrity of the force, and in my opinion, the State police could not bargain away this basic responsibility in a labor contract. *See, e.g., Philadelphia Housing Authority v. Union of Security Officers # 1*, 500 Pa. 213, 455 A.2d 625 (1983)(where arbitrator found that security guard had defrauded elderly tenant arbitrator was without authority to overturn discharge of security guard).[2]

As set forth in *City of Washington* no adjudicatory body has unlimited discretion and in the case of Act 111 arbitration disputes, the "scope of the submission to the arbitrator [is] limited to conflicts over *legitimate* terms and conditions of employment." *Id.* at 442. Where, as here, a state police officer is charged with felonious criminal conduct that impinges on his good moral character, and the arbitrator determines that the charges are in fact proven and true, I believe that the arbitrator does not have the power to order that the officer be reinstated. *See, e.g., Philadelphia Housing Authority v. Union of Security Officers # 1, supra.*

In circumstances where an arbitrator finds that a trooper has committed felonious criminal conduct, the matter of the trooper's reinstatement to the police force is not a legitimate or proper dispute concerning the terms and conditions of employment with the State Police, because the State Police cannot appoint officers to the force who do not meet the

**2.** I recognize that in *Philadelphia Housing* the court in dicta appeared to state a scope of review founded upon the "essence test." However, the Court vacated the arbitrator's award on the basis that the arbitrator had no authority to enter such an award because the Housing Authority could not bargain away its responsibility to ensure the integrity of its security officers. In other words, it was not a legitimate dispute about the terms and conditions of employment and thus could not be a proper scope of the arbitrator's review. This meets the scope of review articulated in *City of Washington.*

statutory minimum qualifications as a State Trooper. *See, e.g., Detoro v. City of Pittston,* 344 Pa. 254, 25 A.2d 299 (1942)(appointment of municipal police officer in violation of legislative mandate for such appointment illegal even if done with approval of the civil service board).

A private employer, and maybe even other Departments of the Commonwealth, may be free voluntarily to hire personnel who have been convicted of serious crimes. However, neither the statute governing an officer's appointment, nor basic public policy, allows the State Police to appoint personnel to the State Police force unless they have "good moral character." 71 P.S. § 1193. As set forth in *Detoro, supra,*

> The legislature has declared in unmistakable terms that merit ascertained in a manner prescribed shall govern appointments to the police department and has formulated and announced the public policy of the state in that respect. An administrative officer is not permitted to violate such declared public policy and no court may sanction its violation. *An employment which in its inception violates such an act as this is illegal and against public policy and it is the duty of the administrative officers of the state or its civil subdivisions to discontinue any illegal employment* . . .

*Id.,* 25 A.2d at 302.

Therefore, it is my opinion that the reinstatement to the police force of these two troopers would be in contravention to the letter and spirit of the minimum qualifications required of the State Police. The arbitrators exceeded their authority, and have made an award that the State Police could not voluntarily have done. I accordingly dissent.