# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh,  :
           Appellant  :
             :
         v.  :   No.  1076 C.D. 2022
             :
Fraternal Order of Police  :   Argued:  October 10, 2023
Fort Pitt Lodge No. 1  :

BEFORE:   HONORABLE RENEE COHN JUBELIRER, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION
BY JUDGE McCULLOUGH               FILED: November 6, 2023

The City of Pittsburgh (City) appeals from the August 30, 2022 order of the Court of Common Pleas of Allegheny County (trial court), denying its statutory appeal and confirming a class action grievance arbitration award issued under what is commonly known as the Policemen and Firemen Collective Bargaining Act[1] (Act 111). Upon review, we affirm.

## Factual and Procedural History

The Fraternal Order of Police, Fort Pitt Lodge No. 1 (FOP), is the collective bargaining representative of police officers employed by the City. The City and FOP are parties to a collective bargaining agreement (CBA) effective January 1, 2019 to December 31, 2022, which addresses the terms and conditions of employment between the parties pursuant to the Pennsylvania Labor Relations Act[2] (PLRA) and Act 111. Section 14.B.II.9 of the CBA addresses retiree healthcare. It provides:

---

[1] Act of June 24, 1968, P.L. 237, No. 111, *as amended*, 43 P.S. §§ 217.1-217.10.
[2] Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. §§ 211.1-211.15.

Any employee who retires after January 1, 2001, provided he or she was hired before January 1, 2005, will be allowed to continue his or her medical insurance coverage for himself/herself and spouse only, through the City. The City shall contribute towards the cost of this husband and wife coverage, for each employee so electing, an amount equal to the amount charged for such insurance by the carrier providing such coverage on the date of his/her retirement. The plan(s) that the City will provide are the same plan choices provided to active employees described in Section 14(B)(1).

For any employee who retires on or after January 1, 2001, the City will be the health insurer of the last resort. As the health insurer of the last resort, the City will provide health insurance benefits for a Police Officer and his/her spouse who retires after January 1, 2001, where such Police Officer and his/her spouse does not have access to enroll in any other group health insurance plan. The City's obligation to provide continuation of health insurance coverage is terminated if the employee is or becomes employed or self-employed or has access to private medical insurance coverage or Medicare through his/her spouse or if his/her spouse has private medical insurance or Medicare or any opportunity to obtain such coverage.

\* \* \* \*

a. Any employee who retires after January 1, 2001 who at the time of retirement has group medical coverage or Medicare or access to such coverage because of other employment or through his/her spouse will not continue to be covered by the City of Pittsburgh, provided however, that should such coverage terminate or cease to be available, the employee will be reinstated to his/her medical insurance benefits by the City of Pittsburgh.

b. Any employee who retires after January 1, 2001, who after retirement has group medical coverage or Medicare

2

or access to such coverage from another source either through his/her employment or through his/her spouse will not continue to receive health insurance benefits from the City of Pittsburgh, provided however, that should such coverage terminate or cease to be available the employees will be reinstated to his/her medical insurance benefits by the City of Pittsburgh.

(Reproduced Record (R.R.) at 253a-54a.)

The instant litigation stems from the death of retired Master Police Officer Gary Rupert on March 8, 2021. Mr. Rupert left behind a wife, Erin, and four dependent children. On April 12, 2021, Mrs. Rupert went for a routine mammogram appointment and was informed that she no longer had healthcare coverage. After her appointment, she received a letter dated April 13, 2021, informing her that her benefits were terminated as of March 31, 2021, due to the death of her husband. Her option was to apply for Consolidated Omnibus Budget Reconciliation Act of 1985[3] (COBRA) continuation coverage because she was not Medicare eligible due to her age. Mrs. Rupert contacted the FOP, which was unaware of the City's practice in terminating a spouse's health insurance benefits after the death of a retiree. Thereafter, the FOP reached out to other members to determine how many others were impacted.

On April 19, 2021, the FOP filed a class action grievance seeking cessation of the City's unilateral actions of eliminating City-sponsored healthcare coverage for the widows and widowers of retired police officers. The FOP alleged that the City violated various sections of the CBA by unilaterally terminating widow/widower and qualified spousal healthcare coverage. Specifically, it asserted that the City "by unilaterally canceling the widow and qualified spouse of retired police officer Gary Rupert from its obligation to provide her and any other member's qualified spouse or domestic partner from retiree medical insurance or Medicare Part B

_____
[3] 29 U.S.C. §§ 1161-1169.

3

payments has expressly violated its obligations under the [CBA]." *Id.* at 317a. The FOP requested that the City provide a list of those retiree spouses who were denied coverage under similar circumstances. *Id.* Moreover, the FOP demanded a "make[-]whole remedy to compensate those widows[/widowers] and/or qualified domestic partners who have been affected by the City's unilateral actions by eliminating retiree medical benefits and Medicare Part B payments." *Id.*

In response, the City contended that no violation of the CBA had occurred because it claimed to have acted in accordance with the parties' past practice. *Id.* at 319a. In support, it referenced an October 1993 Memorandum from Carla Coyne, Compensation Administrator, Department of Finance, to Patrick McNamara, then-President of the FOP, entitled "October 15, 1993 Retirement Meeting," in which it asserted authorized termination coverage for surviving spouses. *Id.* at 319a-20a. The October 1993 Memorandum referenced a handout that Ms. Coyne intended to distribute at the upcoming meeting, which stated in the last paragraph on the second page that "[t]he City will provide the retired Police Officer and his/her eligible spouse with the applicable benefits from the date of his/her retirement until the retired Police Officer becomes deceased." *Id.*

The grievance was timely processed in accordance with the grievance procedure of the parties' CBA. Evidentiary hearings were conducted on October 13, 2021, and October 15, 2021. The ultimate issue, as agreed upon by the parties, was "whether the City violated Section 14 of the CBA when it denied medical coverage to the surviving spouse of a retiree and, if so, what shall the remedy be." *Id.* at 68a.

On October 13, 2021, the FOP presented the testimony of Penny Jo Cummins, spouse of deceased retired police officer, Glenn Cummins. Mr. Cummins passed away on March 25, 2021, and the City terminated Mrs. Cummins' benefits

4

without notice. *Id.* at 71a. She discovered that she no longer had health insurance when she was unable to refill her prescriptions. Thereafter, she received a letter from the Pennsylvania Department of Human Services, providing that she and her son qualified for welfare benefits. *Id.* On cross-examination, she testified she never received any information from the City regarding termination of her healthcare benefits, or her eligibility for COBRA continuation coverage. *Id.* at 72a.

Mrs. Rupert testified that she was married to her deceased husband, Gary, for almost 25 years. In 2020, Mr. Rupert was employed as the chief of police at Washington and Jefferson College where Mrs. Rupert also worked as a substitute teacher. Both lost their jobs and healthcare coverage due to circumstances related to the COVID-19 pandemic. Accordingly, they were reinstated on the City's retiree health insurance plan. *Id.* at 74a-75a. Mrs. Rupert received a letter dated April 13, 2021 from the City, noting the cessation of benefits and her eligibility for healthcare under COBRA. She contacted the pension office which confirmed her termination of benefits. Mrs. Rupert sought COBRA benefits but was informed that her coverage would be approximately $1,400.00 per month, which is the entirety of her spousal pension benefit. Mrs. Rupert is currently on Medicare and her dependent children are covered under the CHIP program. *Id.* at 75a-76a.

The FOP called FOP President Robert Swartzwelder. President Swartzwelder has been an active member of the FOP since 1995 and testified that this was the first instance where he heard of the City stopping widow/widower medical coverage. He confirmed this with the FOP Executive Board. President Swartzwelder confirmed that the FOP has very few, brief interactions with widows/widowers, usually only for life insurance inquiries. *Id.* at 80a. President Swartzwelder was knowledgeable in the CBA retiree healthcare provisions and noted only minor changes

to the language since the 1990s. He testified that, for hires before 2005, "[t]he employee plus spouse has standing under the contract to receive retiree medical from their retirement date up until age 65. Once that person reaches age 65, they must make a timely notice to receive Medicare and also their Medicare Part B benefits." *Id.* at 79a-80a. A retiree's dependent children are not given healthcare coverage. He testified that spousal coverage terminates only when coverage is available through alternative means, such eligibility for group health insurance or Medicare. Healthcare benefits are automatically reinstated should a retiree or spouse be dropped from such coverage. *Id.*

On cross-examination, President Swartzwelder testified that police officers had to be hired prior to January 1, 2005, to receive retiree medical coverage. Officers hired from 2005 through 2015 receive retiree medical coverage in a medical trust. Officers hired after 2015 do not receive such benefits. Furthermore, he testified that the instant matter is a class action grievance and the FOP reached out to retiree members and their families to calculate how many widows/widowers were denied coverage. He acknowledged that the FOP receives notice once a member dies and provides general guidance to the widow/widower, if contacted. *Id.* at 84a-85a. Moreover, President Swartzwelder testified regarding the October 1993 Memorandum, cited by Deputy Sheriff Stangrecki in denying the grievance. The October 1993 Memorandum, titled "October 13, 1993 Retirement Meeting," was communicated to former FOP President Patrick McNamara who intended to present it at the meeting. The last paragraph on the second page provides: "[t]he City will provide the retired Police Officer and his/her eligible spouse with the applicable benefits from the date of his/her retirement until the retired Police Officer becomes deceased." *Id.* at 425a. On redirect, President Swartzwelder testified that the October 1993 Memorandum was never cited or incorporated into the parties' CBA. *Id.* at 90a-92a.

6

A second arbitration hearing was conducted on October 15, 2021, during which the City presented the testimony of Jamie Warnock, the manager of Wellness and Benefits for the City of Pittsburgh, hired in 2002. She testified that she administers the retiree benefits and assists retirees and their spouses with Medicare eligibility. She testified that, at least since 2006, the City has terminated healthcare for spouses of deceased retirees. *Id.* at 143a. When she is notified that a spouse is under the age of 65, she will contact the group health insurance so necessary COBRA paperwork is circulated. *Id.* at 144a. Where the spouse is over the age of 65, he/she is removed for Medicare Part B benefits. *Id.* She testified that 13 surviving spouses, under 65, were removed from medical benefits dating back to 2013. The most recent data shows that 104 surviving spouses, over 65, were removed from Medicare Part B benefits dating back to 2013. *Id.* at 142a-45a. Ms. Warnock testified regarding a Retirement Benefit Instruction Sheet for Police Officers, dated July 14, 1994. *Id.* at 145a. On cross-examination, Ms. Warnock conceded that the FOP is not notified when a surviving spouses' medical coverage is terminated. Six spouses, over 65, were terminated from the City's healthcare in 2021, 5 of which since the grievance was filed. Four spouses, under 65, were terminated from the City's healthcare in 2021, 3 of which after the grievance was filed. *Id.* at 146a-52a.

Tara DiSimono, office manager of the Policemen's Relief and Pension Fund, was called as a witness via subpoena. She testified that when a retiree passes away, Ms. DiSimono is usually notified by the family. She will ask the spouse whether he/she is over the age of 65, and if so, Medicare Part B supplemental benefits will be terminated. The surviving spouse will have a choice between two Medicare plans. If the spouse is under 65, she will inform them he/she is to receive COBRA packets. On cross-examination, she conceded that she plays no role in the cancellation of the

7

medical benefits or the Medicare supplemental benefit. She will instruct the surviving spouse to contact the Wellness and Benefits Office for further information. *Id.* at 152a-58a.

The Arbitrator issued his Award on March 15, 2022, sustaining the grievance. The Arbitrator found that the language of the CBA is not ambiguous, and clearly sets forth the reasons for termination of the surviving spouse's coverage and the "death of the retiree is not one of those reasons." (Award at 15; R.R. at 28a.) The Arbitrator also determined that the City failed to establish that the termination of surviving spouse healthcare benefits was an established past practice between the parties. The Arbitrator concluded that the City violated the clear and unambiguous provisions of Section 14 of the CBA when it discontinued the healthcare coverage for the surviving spouse upon the death of the retiree.

Citing *Elkouri & Elkouri*, "How Arbitration Works," 6th Edition (2003), the Arbitrator noted that a past practice must be unequivocal, clearly articulated and acted upon, and ascertainable over a period of time between the parties. Here, he discredited the City's claim that the October 1993 Memorandum authorized the termination of such coverage because the City provided no documentation or other evidence that the attached pages were, in fact, presented at any meeting between the parties, or that the parties ever discussed or adopted the exclusion of medical coverage for surviving spouses upon the death of the retiree. Moreover, the Arbitrator noted that no such language was ever included in the CBA and that the October 1993 Memorandum was not incorporated into the parties' CBA. *Id.* The Arbitrator found the testimony of President Swartzwelder credible that the FOP first became aware of the City's actions in April 2021, and that, although the practice was in effect for 15 years, it was not mutually recognized by the parties. *Id.*

8

The Arbitrator disagreed with the City's position that consideration of past practices was necessary to clarify the language of Section 14 because he found Section 14 was unambiguous. In his view, Section 14 "clearly sets forth the reasons for termination of the surviving spouse's coverage and the death of the retiree is not one of those reasons." *Id.* Rather, the Arbitrator noted the only conditions identified in the CBA in which the City may terminate spousal coverage are in instances of group health or Medicare eligibility. He emphasized that if the City sought for medical benefits to terminate upon the death of a retiree, "it would have been a simple and elementary concept to incorporate." *Id.* Based on his interpretation of the CBA, the Arbitrator concluded that the City had violated the clear and unambiguous provisions of Section 14 when it discontinued the healthcare coverage for the surviving spouse upon the death of the retiree. As the remedy, the Arbitrator directed the City "to make restitution to the adversely affected survivors who are not otherwise excluded from coverage." *Id.* at 16; R.R. at 29a.

On April 18, 2022, the City appealed the Arbitration Award to the trial court. The City argued that the Arbitrator exceeded his authority by adding a term about survivors to the retiree provisions of the CBA. (R.R. at 8a.)

On August 30, 2022, the trial court entered an order denying the City's appeal and upholding the Arbitration Award. The trial court reasoned that the Arbitration Award was a proper interpretation of the CBA rather than a reformation of it because the City can legally provide healthcare, healthcare benefits are a benefit under the terms of the CBA, and the CBA, as interpreted by the Arbitrator, does not state that death of the retiree is an instance which terminates healthcare to the retiree's surviving spouse.

The City now appeals[4] and raises the following issue:

> Did the [trial court] abuse its discretion when it found that [the Arbitrator] did not exceed his authority where his grievance award overtly reformed the working agreement between the City [] and the [FOP] by adding the term "surviving spouse" to the section pertaining to healthcare?

(City's Brief at 8.)

## Discussion

The City argues that the Arbitrator "overtly reformed" the CBA by adding the term about survivors to the provisions addressing medical coverage benefits. It contends that this not only exceeded the Arbitrator's authority, but it was also contrary to the City's long-standing practice of ceasing benefits on the last day of the month of the eligible retired employee's death, which is consistent with the October 1993 Memorandum. Applying principles of contract interpretation, the City contends that

---

[4] The scope of judicial review applicable to such an appeal is "narrow *certiorari*," which applies to the decisions of the courts reviewing arbitration awards. *Township of Wilkins v. Wage & Policy Committee of the Wilkins Township Police Department*, 696 A.2d 917 (Pa. Cmwlth. 1997). Narrow *certiorari* restricts the court to questions only concerning: (1) the jurisdiction of the arbitrators; (2) the regularity of the arbitration proceedings; (3) an excess of the arbitrator's powers; and (4) deprivation of constitutional rights. *Pennsylvania State Police v. Pennsylvania State Troopers Association*, 741 A.2d 1248 (Pa. 1999); *Township of Moon v. Police Officers of the Township of Moon*, 498 A.2d 1305, 1313 (Pa. 1985).

A dual standard of review applies to Act 111 appeals. *Pennsylvania State Police v. Pennsylvania State Troopers' Association*, 840 A.2d 1059 (Pa. Cmwlth. 2004). Where resolution of an issue turns on a pure question of law, or the application of law to undisputed facts, the court's review is plenary. However, where resolution of an issue depends upon factfinding or upon interpretation of the CBA, reviewing courts apply the extreme standard of deference applicable to Act 111 awards; that is, they are bound by the arbitrator's determination of these matters even though the reviewing court may find them to be incorrect. *Id.* Courts are required to give great deference to an arbitrator's award, which furthers the legislative intent of not bogging awards down in litigation. *Town of McCandless v. McCandless Police Officers' Association*, 901 A.2d 991, 998 (Pa. 2006). Errors of law, erroneous interpretation of, or misapplication of, language in a collective bargaining agreement "are not a valid basis for vacating an Act 111 arbitration award." *City of Pittsburgh v. Fraternal Order of Police, Fort Pitt Lodge No. 1*, 224 A.3d 702, 708 (Pa. 2020) (*City of Pittsburgh*).

10

the record evidence indisputably demonstrates that the parties did not have a meeting of the minds or have a mutual intention about continuing medical coverage for surviving spouses; therefore, the Arbitrator's reformation of the CBA was unjustified. The City maintains that the evidence does not support the conclusion that the parties shared an intention about the purpose of Section 14 which was not accurately expressed in the writing and required reformation. It notes that the term "surviving spouse" does appear once in the CBA, to provide healthcare benefits to the surviving spouse of an officer killed in the line of duty. (CBA at 67.) Therefore, the City contends, it is clear that the parties' intent was to grant healthcare benefits only to the surviving spouse of an officer killed in the line of duty, not to the surviving spouse of retired employees. Accordingly, the record here did not support the Arbitrator's overt reformation of Section 14 of the Agreement.

Pennsylvania case law holds that a labor arbitrator's powers lie solely in interpreting the parties' agreement, *City of Philadelphia v. Fraternal Order of Police, Lodge No. 5*, 786 A.2d 291 (Pa. 2001), and a grievance arbitrator does not have the authority to add terms to the CBA or change the language contained therein. *Borough of Montoursville v. Montoursville Police Bargaining Unit*, 958 A.2d 1084 (Pa. Cmwlth. 2008). It is firmly settled that the intent of the parties to a written contract is contained in the writing itself; when a written contract is clear and unequivocal, its meaning must be determined by its contents alone, and an arbitrator is required to give effect to that language. *Id.*; *Clairton Slag, Inc. v. Department of General Services*, 2 A.3d 765, 773 (Pa. Cmwlth. 2010); *East Crossroads Center., Inc. v. Mellon-Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965).

In interpreting such a contract, the ultimate goal is to ascertain and give effect to the intent of the contracting parties as reasonably manifested by the language

of their written agreement. *Department of Transportation v. Pennsylvania Industries for the Blind and Handicapped*, 886 A.2d 706, 711 (Pa. Cmwlth. 2005). "Arbitrators are required to address the issues submitted within the context of the positions of the parties and effectuate the relief requested, not to reform the collective bargaining agreements." *Michael G. Lutz Lodge No. 5, of Fraternal Order of Police v. City of Philadelph*ia, 129 A.3d 1221, 1230 (Pa. 2015) citing *Marple Township v. Delaware County F.O.P. Lodge 27*, 660 A.2d 211, 215 (Pa. Cmwlth. 1995). "[A]n arbitrator does not have a roving commission to do what he or she believes is necessary to put everything right, to construct a 'better agreement.'" *Id.* at 1230.

The silence of a labor contract or absence of language dealing specifically with an issue does not prevent an arbitrator from drawing conclusions related to the issue. *School District of City of Allentown v. Hotel and Restaurant Employees International Union, Local No. 391, AFL-CIO*, 654 A.2d 86 (Pa. Cmwlth. 1995). An arbitrator has leeway to craft an award that addresses the issues raised by the parties. *Wilkins Township v. Wage Policy Committee of Wilkins Township Police Department*, 162 A.3d 581 (Pa. Cmwlth. 2017). Once an issue is properly placed in dispute, arbitrators are free to resolve that issue in a fair manner within the total context of the agreement; they may examine the writing itself, in addition to the circumstances surrounding its execution, as well as other indicia of the parties' intentions. *Association of Pennsylvania State College and University Faculties v. Commonwealth of Pennsylvania*, 436 A.2d 987 (Pa. Cmwlth. 1981); *City of Wilkes-Barre v. City of Wilkes-Barre Police Benevolent Association*, 814 A.2d 285 (Pa. Cmwlth. 2002).

Here, the City's position that the Arbitrator impermissibly and "overtly" reformed the CBA is based chiefly on the fact that the term "surviving spouse" does not appear in Section 14.B.II.9 of the CBA. The City contends that the Arbitrator

12

"added" the term surviving spouse to Section 14.B.II.9 of the CBA, and that the Arbitrator's reformation of the CBA in this manner "was contrary to ordinary contract principles of mutual intention." (City's Brief at 21.) It contends that principles of contract law permit reformation under very limited circumstances, for example, when there is evidence of a mutual mistake, or where the writing does not capture the intention of the parties. *Id.* at 19. The City argues that the evidence before the Arbitrator indisputably demonstrated that the parties did not have a meeting of the minds or have a mutual intention about continuing medical coverage for spouses who survive after the death of a retired police officer. Specifically, it points to evidence of its past practice of stopping coverage for the surviving spouse at the end of the month of the retiree's death. Therefore, it contends, the Arbitrator's overt reformation of the CBA to add survivor benefits was improper because it was unnecessary to enable specific performance of the parties' intentions.

We find the City's argument unpersuasive for a number of reasons. First, the City touts principles of contract interpretation to support its main argument that the Arbitrator's reformation of the CBA was unwarranted in this situation. That assertion fails, not only because it requires us to accept the City's premise that a reformation of the CBA indeed occurred, but also because it would require us to consider whether the Arbitrator erred in interpreting the law, *i.e.*, the principles of contract interpretation, which falls outside our standard of review. *Town of McCandless v. McCandless Police Officers Association (Franceschina)*, 952 A.2d 1193, 1195 (Pa. Cmwlth. 2008) ("[E]rror of law is not enough to allow a court to vacate an Act 111 arbitration award."). Second, our review of the record shows that, contrary to the City's contention, the Arbitrator did not exceed his authority by overtly reforming the CBA.

13

In *City of Pittsburgh v. Fraternal Order of Police Fort Pitt Lodge No. 1 (On-Duty and Off-Duty Pay for Events)*, 111 A.3d 794 (Pa. Cmwlth. 2015) (*en banc*), this Court found the arbitrator impermissibly reformed the parties' CBA because his award was not based on any contractual interpretation, but rather on his opinion of what he believed would be a fair outcome. There, two City police officers were assigned to direct traffic at multiple sporting events while on-duty and paid in accordance with the CBA executed by the City and the police officers' union. The police officers later filed grievances alleging that off-duty police officers performing the same job were paid at a higher, secondary employment rate of pay. The City denied the grievances and the matter proceeded to grievance arbitration. The arbitrator ultimately issued an award sustaining the grievances and directing the City to pay on-duty police officers working large events the same rate being paid to off-duty officers working those events as secondary employment. The arbitrator reasoned "based upon the grievances and the arguments presented, that on-duty officers sent to work special events **should be paid** at the same rate of pay as the rate being paid to officers working the special events as a secondary employment detail" and concluded that **it would be "unfair"** to pay on-duty officers less than those working secondary employment. *Id.* at 799 (emphasis added).

The common pleas court vacated the award and dismissed the grievances. The common pleas court held, *inter alia*, that the arbitrator had disregarded the CBA's compensation terms and "instead made a judgment as to what the CBA **should** say as opposed to what it **actually** says." *Id.* at 798 (emphasis in original). The common pleas court also noted that the arbitrator could not point to any language in the CBA to support his analysis.

Before this Court, the union argued that the arbitrator's award was based on his "interpretation of" a provision in the CBA regarding compensation for secondary employment work. *Id.* at 800. The City rejoined that the arbitrator did not interpret the CBA, but rather he wrote a new term to raise the pay of the on-duty officers to match the pay of off-duty officers. The City argued that the CBA did not require that officers doing the same or similar tasks be paid the same. *Id.* at 800-01.

This Court affirmed the common pleas court's order, noting that although the question posed to the arbitrator was whether the wages paid to on-duty officers violated the CBA, the arbitrator did not discuss, much less purport to interpret, the language of any provision in the CBA. *Id.* at 801. We explained

> [t]he purpose of grievance arbitration is to resolve disputes over a provision of an existing contract. The arbitrator explained his award on the grounds that it would be "inequitable" not to give on-duty officers the same wage paid to an off-duty officer. An Act 111 grievance arbitrator does not have jurisdiction or authority to rely on principles of equity to reform the CBA.

*Id.* at 802.

We concluded, therefore, that the arbitrator's award was not based on his interpretation of the CBA and, thus, constituted an instance of "overt reformation," which was beyond his jurisdiction and authority. *Id.*

In contrast, *City of Pittsburgh* involved a union's unsuccessful contention that an arbitrator's award impermissibly reformed the parties' CBA because it imposed an entirely new contractual obligation upon the City. There, unable to fill posts through volunteers, the City's Bureau of Police required 70 officers to work the 2016 Pittsburgh Marathon on their "pass days." 224 A.3d at 704. The officers were paid a minimum of four hours overtime at a time-and-a-half rate, plus additional overtime for any more

hours worked. The union filed a grievance, arguing that the City violated the CBA by mandating officers work secondary employment when the CBA stated it was strictly voluntary. *Id.* The grievance placed several sections of the CBA before the arbitrator, including: "Section 4 Management, Section 8 Hours of Work, Section 24 Secondary Employment, Section 6 Salaries, Section 9 Overtime, and Section 17 Scope of Agreement." *Id.* at 704.

The arbitrator found that there was nothing in the CBA "defining the compensation to be paid for the cancellation of a pass day, whether a pass day can be partially cancelled, or when a pass day shift begins for purposes of cancellation and compensation." *Id.* at 706. The arbitrator thus reasoned that it was necessary to "look to related contractual language regarding hours of work and compensation in order to determine the parties' intent with regard to these pass day subjects." *Id.*

On appeal, this Court held that the arbitrator impermissibly **reformed** the CBA to add a provision for compensation for loss of a pass day that was not in the CBA. We reasoned:

> The arbitrator acknowledged that the CBA did not contain any provision for additional compensation for the cancellation of a pass day. Moreover, the arbitrator held that Section 8.D of the CBA applied to the cancellation of pass days and provided that four hours was the minimum overtime pay set by the CBA for such a callout. Instead of basing her award on an interpretation of these provisions or any other provision of the CBA related to compensation, overtime, or callouts, the arbitrator held that officers were entitled to a minimum of eight hours of overtime pay for cancellation of a pass day because "the City could not partially cancel a pass day without negating the concept of [two] consecutive days off." In essence, the arbitrator created a remedy for loss of a pass day that she acknowledged did not exist in the CBA; she

16

"decided, apparently, what the CBA should say and did not rely upon what it does say."

*Id.* at 708-09.

The Supreme Court allowed the union's appeal to consider whether this Court erred. Discerning no "overt instance of reformation," the Supreme Court reversed this Court agreeing with the union that "the arbitrator's legal reasoning, however flawed, demonstrate[d] sufficient interpretive focus." *Id.* at 714.

Here, unlike in *On-Duty and Off-Duty Pay for Events*, 11 A.3d 794, where the arbitrator relied on principles of equity in fashioning his award, the Arbitrator's reasoning was clearly based on his examination of different provisions of the CBA and based his Award on what the CBA said. The parties held differing interpretations of the CBA, disagreeing as to healthcare coverage for the surviving spouse upon the death of the retiree.

In relevant part, Section 14.B.II.9 of the CBA states that a City police officer who retires after January 1, 2001, provided he or she was hired before January 1, 2005, will be allowed to continue his or her medical insurance coverage for himself/herself and his or her spouse. The City shall contribute to towards the cost of this "husband and wife coverage" if the retiree so elects. For employees who retire after January 1, 2001, the City will be the health insurance of last resort, and the City will provide health insurance benefits for the retired police officer and his/her spouse who do not have access to any other group health insurance plan. The City's obligation terminates when the retired employee has access to private medical insurance coverage or Medicare through his/her spouse or his/her spouse has private medical insurance or Medicare, or any opportunity to obtain such coverage. Section 143.II.7 requires that for a spouse to qualify for the healthcare benefit he/she must be "the spouse [of the retiree] at the time of retirement." (CBA at 67.)

17

The Award did not "add" surviving spouses to Section 14.B.II.9, as contended by the City. Rather, the Arbitrator found, based on the above, that the CBA explicitly lists terminating events for health insurance coverage, **and that the death of a retired officer is not one of those enumerated terminating events**. ("There is no reference to the death of the retiree.") (Award at 15.) The Arbitrator took that to mean that a surviving spouse will continue to have health insurance coverage until one of the specific terminating events occurs. This case is more akin to *City of Pittsburgh*, where the arbitrator examined the provisions of the CBA, construed them, and offered an interpretation. Although the City's argument is couched in terms of an impermissible and overt reformation, its argument is, in reality, no more than an assertion that the Arbitrator erred in construing Section 14.B.II.9 of the CBA. Whether a surviving spouse is entitled to continued healthcare coverage after the death of his/her retired spouse is a question of contract interpretation and the parties and this Court are bound by the Arbitrator's construction within the narrow *certiorari* standard of review. *Borough of Jenkintown v. Hall*, 930 A.2d 618, 622 (Pa. Cmwlth. 2007). Interpreting the health insurance provision of the CBA and its meaning in the absence of specifics regarding the death of a retiree was far from an "overt" instance of reformation. Because the Arbitrator's Award was based on the Arbitrator's interpretation of disputed terms and conditions in the CBA, it is entitled to deference. *Borough of Montoursville*, 958 A.2d at 1089.

Based on the foregoing, the order of the trial court is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh, : 
          Appellant : 
 : 
      v. :  No.  1076 C.D. 2022
 : 
Fraternal Order of Police : 
Fort Pitt Lodge No. 1 : 

## *ORDER*

AND NOW, this 6th day of November, 2023, the August 30, 2022 order of the Court of Common Pleas of Allegheny County is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge